BENJAMIN RUDIN (State Bar No. 292341)
3830 VALLEY CENTRE DR.
STE. 705, #231
SAN DIEGO, CALIFORNIA 92130
Telephone: (858) 256-4429
Email: ben@benrudin.law

Attorney for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

KEVIN HAGAN

                                Plaintiff,

v.

Valley State Prison Health Care CEO Raul
Recarey, Valley State Prison Warden
Landon Bird, and California Department
of Corrections and Rehabilitation
Secretary Kathleen Allison in their official
capacities.

                                Defendants.

Case No.:

**COMPLAINT FOR TEMPORARY
RESTRAINING ORDER AND INJUNCTION**

## PARTIES

1. Plaintiff Kevin Hagan ("Plaintiff") is an inmate within the California Department of Corrections and Rehabilitation ("CDCR").

2. Defendants Raul Recarey ("CEO Recarey") and Landon Bird ("Warden Bird") are employees at Valley State Prison ("VSP"), the Health Care CEO and Warden, respectively, and are sued in their official capacities.

3. Defendant Kathleen Allison ("Secretary Allison") is the Secretary of CDCR and is sued in her official capacity.

## JURISDICTION AND VENUE

4. Jurisdiction is conferred on this Court under 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4) because this suit is brought primarily under 42 U.S.C. § 1983.  Jurisdiction is also conferred by 28 U.S.C. § 1331 because the cause of action arises under the Constitution and laws of the United States.  Jurisdiction is conferred for the remaining issues by 28 U.S.C. § 1367 because they form part of the same case or controversy. Jurisdiction is also conferred on this Court by 18 U.S.C. § 3626 because it includes a request for injunctive relief in a civil action related to prison conditions.

5. Venue is proper in the United States District Court, Eastern District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this claim occurred there.  Venue is also proper under 28 U.S.C. §

1391(b)(1) because, Plaintiff is informed and believes and thereon alleges that some

defendants reside in the Eastern District of California, and all defendants reside in

California.

<u>FACTS</u>

6. Plaintiff has a history of chronic back pain.

7. On April 7, 2016, Plaintiff saw Dr. Frank Yoo ("Dr. Yoo") for his back injuries,

who wanted to see the x-ray films before deciding on surgical treatment, and asked

Plaintiff be treated with more potent pain medication as needed.  (Exhibit K).

8. On May 27, 2016, Dr. M. Santos ("Dr. Santos") documented that Plaintiff was

"seen by neurosurgeon 5/19/2016 and was noted to have L5 screw that seems to be in

the lateral recess [space in spinal canal toward the sides] where the traversing S1 nerve

root <u>should be</u>, and compression deformity at L1.  [emphasis added]" (Exhibit P).

9. On June 14, 2016, Plaintiff's spinal fusion postsurgical changes were

redemonstrated with hardware extending from L3-S1, and the changes appeared stable

with a stable L1 compression fracture.  (Exhibit AF).

10. On July 4, 2016, Dr. Santos documented that Plaintiff has persistent low back

pain with numbness on the plantar aspect of both feet and shooting pain on the right

leg, Plaintiff stated he had difficulty walking due to the pain, morphine was discontinued

because of <u>possible</u> drug diversion, and Plaintiff requests surgery even though

neurosurgeon stated it would likely improve his pain by about 20% from baseline. (Exhibit P).

11. On July 14, 2016, Plaintiff was transported to Sharp Hospital complaining of severe pain in his back and chest. (Exhibit AC).

12. At this visit, Plaintiff had an MRI showing no evidence of solid fusion between the vertebral bodies, L2-3 spinal canal and lateral recess stenosis with impingement (rubbing or pressure) of the traversing L3 nerve roots bilaterally, and left L5 neural opening narrowing with equivocal nerve root impingement. (Exhibit AD).

13. On July 21, 2016, Plaintiff saw Dr. Yoo again due to back injuries. Dr. Yoo agreed to do surgery to remove the hardware: L3 to ilium (large broad bone forming upper part of each half of pelvis) posterior instrumentation (placement of screws and rods) and L2-3 bilateral laminotomies (removal of roof of spinal canal). (Exhibit A, J)

14. On August 3, 2016, Dr. Roberts downgraded the request for treatment from "urgent" to "routine." (Exhibit Q).

15. Dr. Yoo noted that Plaintiff is doing miserably. He added the medical decision-making process: Plaintiff understands he is a challenging patient and that any further surgery may not be of any benefit to him, but he is so miserable that he has attempted suicide and would like to proceed with surgery. Plaintiff was told there might be a minimal possibility of only getting a small fraction of his pain resolved (less than 20%),

but he still wants to proceed.  Per Dr. Yoo, Plaintiff needs a minimal procedure at L2-3 or a giant procedure from T10 down to the ilium.  (Exhibit J)

16. Dr. Yoo requested authorization for all his recommendations: (1) Removal of all posterior instrumentation to give Plaintiff some back pain relief and definite relief of leg pain, (2) decompressive procedure with laminotomies to give him leg pain relief and possibly back pain relief, and (3) if need be, anterior lumbar interbody fusion and perhaps sacroiliac-iliac posterior fusion.  (Exhibit J).

17. On December 6, 2016, Plaintiff saw Dr. Yoo again, who stated that he would put Plaintiff on the schedule for back surgery soon.  Despite that, Plaintiff never received his back surgery.  (Exhibit A).

18. On January 11, 2017, the back surgery was denied.  (Exhibit R).

19. On January 31, 2017, Plaintiff was transported to Tri-City ED, complaining of chronic back pain (currently 10/10) not relieved with his medications, hematuria (blood in urine) since that morning, and the pain is radiating to the front, right side worse than left.  (Exhibit AE).

20. On April 11, 2017, urgent requests for an MRI of Plaintiff's lumbar spine with and without contrasts were approved.  (Exhibit S).

21. On September 18, 2017, Dr. Mossler documented Plaintiff's request to follow up with Dr. Yoo because his surgery was denied.  (Exhibit T).

22. Plaintiff has suffered excruciating pain in his lumbar area. He has to rock back and forth to manage the pain. He has not received the back surgery that Dr. Yoo stated that he needs. On multiple occasions, Plaintiff has been informed that his operation was approved, only to hear later that it was denied.

23. On February 15, 2018, a CT scan of Plaintiff's lumbar spine was approved. (Exhibit U).

24. On March 29, 2018, a CT of Plaintiff's lumbar spine was done. It showed severe central canal and bilateral neural opening narrowing. (Exhibit AG).

25. On April 30, 2018, an MR lumbar spine without contrast was done. New leftward curvature centered at L2-L3 and retrolisthesis (backward slippage) of L1 on L2 and L2 on L3 was found. Also found was new severe central canal narrowing at L2-L3 and mild central canal narrowing in the lower lumbar spine with probable compression of the left exiting L5 nerve root. (Exhibit AH).

26. On May 2, 2018, Dr. Messler requested a bone density screening. (Exhibit V).

27. On May 25, 2018, Dr. Santos requested Plaintiff receive the neurosurgery advised by Dr. Yoo. (Exhibit W).

28. On June 5, 2018, Dr. Yoo revised his surgery recommendation to a lateral L3-L4 lumbar interbody fusion and posterior instrumented fusion with decompression and possible hyperlordotic (excessive curving inward) graft at L2-L3 to give him some back lordosis. Plaintiff also complained of numbness in his toes. (Exhibits Y and Z).

29. On July 17, 2018, the surgery was approved by Dr. Roberts.  (Exhibit X).

30. On August 8, 2018, the IVMC denied the surgery for Plaintiff.  (Exhibit AA).

31. After this denial, Plaintiff attempted suicide again and needed 47 staples in his right arm.

32. Plaintiff was then transferred to Salinas Valley State Prison ("SVSP").  There, they provided him methadone (pain medication) to mitigate the pain.

33. On a pain scale of 0-10, 10 being the worst pain ever and zero (0) being no pain, the methadone reduced the pain from a 10 to a 7.

34. Although methadone helped reduce the pain, Plaintiff still suffered back pain and had to rock back and forth continuously to manage the pain.

35. Plaintiff was transferred to Atascadero State Hospital, where they kept him on the methadone, but suddenly transferred back to Richard J. Donovan, where he was taken off the methadone due to his complaining about stomach issues and requesting to get off it. (Exhibit C).  However, the methadone was not replaced with anything else, and the pain returned to at least an 8.

36. On March 7, 2019, Plaintiff was informed that his gabapentin (nerve pain) will be tapered off. (Exhibit C).  He was on duloxetine and was being prescribed ibuprofen and Tylenol.

37. Also on March 7, 2019, Plaintiff stated a willingness to participate in physical therapy.  (Exhibit C)

38. On March 15, 2019, Plaintiff complained that his pain is an eight (8) out of a 10 daily and getting no comfort, and said he is filing a grievance against the doctor who took him off methadone.  (Exhibit D).

39. On March 27, 2019, Plaintiff saw his primary care provider (PCP) for a follow-up from chest pain and was advised narcotic pain medications are not used for chronic pain and was referred to physical therapy.  (Exhibit C)

40. On April 4, 2019, Plaintiff told a nurse that his current treatment was not enough to manage his pain, and the nurse said he does not meet the criteria to go back on methadone.  (Exhibit C).

41. On April 4, 2019, Plaintiff filed a health care grievance (602 HC) stating he is in severe pain in his lower back and down his right leg. He suffers daily without proper pain medication and requests adequate pain medication. (Exhibit D).

42. On April 23, 2019, the PCP documented narcotics would not be ordered for pain management, and Plaintiff was advised to continue with duloxetine (nerve pain medication) and acetaminophen.  (Exhibit B).

43. On May 29, 2019, Plaintiff refused physical therapy because it was too painful. (Exhibits B and G)

44. On July 9, 2019, the PCP wrongly documented that Plaintiff did not appear in pain. Narcotics would not be prescribed, and Plaintiff, in desperation, agreed to take ibuprofen and nortriptyline (nerve pain medication).  (See Exhibit B).

45. Ever since he was transferred to VSP, Plaintiff's pain has continued, but he has not gotten pain medication or the surgery.

46. On January 8, 2020, Plaintiff saw his PCP and expressed that he is in severe back pain and needs adequate pain medication. (Exhibit G).

47. The PCP refused to prescribe pain medication. (Exhibit G).

48. On January 9, 2020, Plaintiff filed a grievance about the doctor visit on January 8 and mentioned he was given Lyrica (nerve pain medication) and a nerve study in 2014. A specialist said he needed back surgery back in July 2016. (Exhibit F).

49. On February 21, 2020, Plaintiff was seen by his PCP.  The PCP noted that Plaintiff had an MRI of his spine on April 30, 2018, which suggested he needed surgery. A Request for Services was submitted for his surgery and was denied on June 22, 2018. The PCP advised Plaintiff to complete physical therapy, and then his case may be referred to the Pain Management Committee (PMC).  (Exhibit G).

50. On March 6, 2020, Plaintiff was seen by his PCP, and his back pain was reviewed. They discussed continuing mental health and physical therapy consultations. (Exhibit E).

51. On March 17, 2020, the Chief Physician & Surgeon reviewed Plaintiff's grievance (Exhibit G) and wrongly stated that Plaintiff reported no sleep interruptions due to pain, performed his activities of daily living, and was able to pick up clothes from the floor and pull them back up.  He could pick up clothes and pull them back up one

time but cannot keep doing that. He also wrongly wrote that Plaintiff had good lateral flexion and rotation movement. He correctly stated that the extension limitations are most likely from instrumentation laminectomies. Also, that Plaintiff performed a straight leg raising test with no reproducible symptoms, but Plaintiff does not remember that. (Exhibit G).

52. Instrumentation laminectomies are often the result of hardware, which Dr. Yoo advised Plaintiff have surgery to get removed. (Exhibit A).

53. On April 9, 2020, Plaintiff again saw a PCP examining his back. It was documented that he takes ibuprofen and amitriptyline (nerve pain medication). His back was examined, and despite him having recommendations from at least one specialist for surgery, the PCP did not document a medical indication for back surgery or additional medications. (Exhibit E).

54. On July 31, 2020, Plaintiff saw PCP and requested a referral for spinal surgery, orthotic shoes, hardware removal from his left thigh bone, pain medications, and physical therapy. A physical exam could not be performed because Plaintiff could not get out of his wheelchair. (Exhibit L).

55. PCP requested an orthopedic surgeon to evaluate Plaintiff's back issues further and ordered an x-ray of Plaintiff's left thigh bone. (Exhibit L).

56. PCP determined orthotic footwear was not needed because Plaintiff cannot walk. (Exhibit L).

57. PCP denied Plaintiff's request for Lyrica, morphine, and methadone and placed orders only for ibuprofen. (Exhibit L).

58. On August 4, 2020, a nurse documented Plaintiff had chronic low back pain, seven (7) surgeries from 2005-2010, and that his back pain has gotten progressively worse, radiating down to his right leg, affecting his daily life activities, and cannot walk. (Exhibit I).

59. On August 13, 2020, an x-ray was done because of Plaintiff's left thigh bone pain. (Exhibit AI).

60. On August 20, 2020, Plaintiff was seen by PCP for a Chronic Care Program appointment. Although Plaintiff is documented as refusing a physical examination, he does not remember refusing one. (Exhibit L).

61. On August 26, 2020, an officer documented that Plaintiff spends 23 hours per day on his bunk, wants to be seen by PMC to get adequate pain medications, and attends chow and ducats but does not participate in the dayroom or yard activities. (Exhibit O).

62. The officer also documented that Plaintiff has been on his pain medications for two (2) years. (Exhibit O).

63. On August 28, 2020, Plaintiff saw Dr. Farr, a board-certified orthopedic surgeon with a fellowship in spine surgery. (Exhibits H and AB).

64. Dr. Farr documented stenosis (a medical condition where the spinal canal narrows and compresses the nerves and blood vessels at the level of the lumbar vertebrae) at the L2-L3 level with prior fusion at the L3-L4, L4-L5, and L5-S1.  He documented that Plaintiff has difficulty with his walking pattern, using a wheelchair and an assistive device for walking.  He recommended repeat MRI, most likely extending the fusion at L2-L3, that hardware removal could be helpful; Plaintiff needs an Electromyography ("EMG") nerve conduction study (measures muscle response to a nerve's stimulation of the muscle).  He also believed that Plaintiff will eventually need a spinal cord stimulator (device that sends low levels of electricity into the spinal cord to relieve pain). For now, a CT scan of the lumbar to confirm there is actual fusion taken place before removing the hardware.  (Exhibit H).

65. On September 25, 2020, Plaintiff saw his PCP for a follow-up with orthopedics.  Noted that Plaintiff has a history of seven back surgeries, and there is a high risk of worsening back issues with additional surgeries and low potential for improvement.  Plaintiff's back pain will be conservatively managed ad will continue to take Motrin and Tylenol for pain.  (Exhibit L).

66. On November 3, 2020, Plaintiff was seen by PCP to discuss topical medications, and it was recommended he continue using Tylenol and Capsaicin cream.  (Exhibit N).

67. On November 15, 2020, Plaintiff submitted a Reasonable Accommodation Request asking for surgery because his constant shoulder pain makes using the bathroom hard. He noted that he mentioned this to Dr. Son. Dr. Son said he must file paperwork to go to court to do anything.  (Exhibit AO).

68. On November 16, 2020, Plaintiff was interviewed and again stated his shoulder was in pain and his awareness of the Americans with Disabilities Act ("ADA") assistant workers and the shower chair available in the housing unit.  (Exhibit AP).

69. On January 8, 2021, Plaintiff was seen by the PCP in the Triage and Treatment Area ("TTA") for complaints of lower back and shoulder pain, notes indicate that he was given education on diet and weight loss recommendations, and ketorolac back injections were ordered. (Exhibit M).  Ketorolac injections are not supposed to be done longer than five (5) days.

70. On February 21, 2021, an order for gabapentin was placed.  (Exhibit M)

71. On February 22, 2021, Plaintiff was seen by the PCP in the TTA, who did not document that a PMC review was medically indicated.  (Exhibit M).

72. On February 23, 2021, Plaintiff returned from a "higher level of care," and the on-call provider ordered gabapentin and Capsaicin cream for his lower back pain. (Exhibit AS).

73. On February 24, 2021, Plaintiff filed a grievance noting he was given adequate pain medication at the Madera Community Hospital and is in severe pain now and needs to see a specialist. (Exhibits AR and AV).

74. Also on February 24, 2021, Plaintiff saw his PCP for admission into the Outpatient Housing Unit. Noted was his long history of chronic lower back pain status post L2-3 fusion and the significant narcotics he was given while in the acute care hospital with COVID-19, pneumonia, and respiratory failure. His PCP explained that narcotics are not indicated for chronic pain management. His pain was to be managed stepwise with non-steroidal anti-inflammatory drugs (NSAIDs), acetaminophen, and possibly tricyclic antidepressants. The PCP ordered naproxen (NSAID) for lower back pain. (Exhibit AS).

75. On March 8, 2021, Plaintiff's PCP ordered Tylenol for lower back pain. (Exhibit AS).

76. On March 10, 2021, Plaintiff was seen by the PCP, who ordered a lumbar spinal MRI. (See Exhibit AK).

77. On March 16, 2021, Plaintiff's requests for medication, a specialty referral, shoulder surgery, and accommodations were denied. (Exhibit AN).

78. On March 17, 2021, Plaintiff received a response to the Reasonable Accommodation Panel that provided no interim accommodation because he could move and had his wheelchair. (Exhibit AU).

79. On March 19, 2021, a doctor's request for EMG for complaints of low back pain was submitted and approved. (Exhibit M).

80. On March 22, 2021, Plaintiff appealed that decision asking to see a specialist and have the surgery if needed. (Exhibit AM).

81. On April 5, 2021, Plaintiff was seen by his PCP and was noted discharged from the Outpatient Housing Unit. His complaint then was back pain with right leg sciatica (pain radiating down along the sciatic nerve) managed with gabapentin, naproxen, Tylenol, and Capsaicin cream. (Exhibit AS).

82. On April 14, 2021, Plaintiff filed a grievance saying he was in severe pain, had just spent 37 days in Outpatient Housing Unit ("OHU"), and was not given adequate pain medication and that he got his 1824 Reasonable Accountability Request sheet back. They failed to do the Armstrong Remedies Plan on him. (Exhibit AT).

83. On April 28, 2021, Plaintiff filed an appeal because he was not satisfied with his response, and he suffers every day, and an investigation should have occurred into violations because he is ADA. (Exhibit AT).

84. On April 29, 2021, the institutional level denied Plaintiff's request for pain medication and to see a specialist. (Exhibit AS).

85. On May 2, 2021, Plaintiff filed an appeal stating he was in severe pain, 8/10 sometimes 10/10, and that he has told his doctors every time he has seen them and asks for help. (Exhibit AR).

86. On May 5, 2021, Plaintiff's lumbar spine x-ray was completed. (Exhibit AK).

87. On May 10, 2021, Plaintiff was seen by PCP, where his lumbar spinal x-ray results were reviewed. He was told to stay with his treatment of omeprazole (acid reducer) and ibuprofen. (Exhibits AK).

88. On May 20, 2021, Plaintiff filed a grievance mentioning he complained on May 9, 2021, and May 19, 2021, about his severe back pain and the doctor not doing anything about it, and requesting an investigation into the violation of his civil rights. (Exhibit AX).

89. On May 27, 2021, Plaintiff submitted a Health Care Services Request form regarding his pain. (Exhibit AK).

90. On May 28, 2021, Plaintiff was seen by PCP and reminded of the upcoming nerve study and EMG with neurology. (Exhibit AK).

91. On June 2, 2021, Plaintiff was seen by PCP. It was noted that he would continue gabapentin while Tylenol was adjusted for better pain coverage. Orders for a nerve study and EMG were approved pending scheduling. Physical therapy was approved, but the frequency was limited due to therapist availability. (Exhibit AL).

92. On June 3, 2021, Plaintiff's request for a CT scan, MRI, and nerve conduction study was denied. (Exhibit AJ).

93. On June 4, 2021, Plaintiff saw the nurse for back and shoulder pain complaints. (Exhibit AL).

94. On June 24, 2021, Plaintiff's appeal for medication and to see a specialist was denied at the headquarters level.  (Exhibit AQ).

95. In June 2021, a nerve study was done and Plaintiff was determined to have nerve damage and immediately placed on Lyrica.

96. On October 4, 2021, a PCP noted that Plaintiff would be referred to a physical therapist and is awaiting neurosurgery consultation.  (Exhibit AW).

97. On October 5, 2021, Plaintiff's appeal regarding his severe pain, his PCP refusing to do anything to relieve his pain, and asking for an investigation into the violation of his civil rights was denied.  (Exhibit AW).

98. A CT scan and MRI were performed in March 2022.

99. As the Health Care CEO at VSP, Warden at VSP, or Secretary of CDCR, defendants CEO Recarey, Warden Bird, and Secretary Allison, respectively, have the power to order that Plaintiff be provided his surgery or pain medications, but have not.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

100. Insofar as required, Plaintiff has exhausted his administrative remedies under the Prison Litigation Reform Act, 42 U.S.C. § 1997e.

101. Plaintiff has exhausted his required remedies under the Government Claims Act, Claim 21005914.  His claim was rejected on December 22, 2021.

### COUNT 1 – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

102. Plaintiff re-alleges and re-incorporates paragraphs 6 through 99.

103. The government's failure to meet its "obligation to provide medical care for those whom it is punishing by incarceration," can constitute an Eighth Amendment violation cognizable under § 1983. Estelle v. Gamble, 429 U.S. 97, 103–05 (1976). To prevail on § 1983 claim for inadequate medical care, a plaintiff must show "deliberate indifference" to "serious medical needs." Id. at 104. This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." Snow v. McDaniel, [681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds by Peralta v. Dillard, 744 F.3d 1076 (9th Cir. 2014) (en banc)].

104. Plaintiff saw a specialist who said he needed surgery.  He saw another one who said he needed surgery.  He has been denied repeatedly.  He has repeatedly informed the prison of his pain and received inadequate pain medications.  When he was taken off the methadone due to his request, he thought he would be put on something else instead of nothing.  Plaintiff has been suffering for years, despite his repeated complaints to prison staff.

105. As a result of not being provided his back surgery and pain medications due to the deliberate indifference of prison staff, Plaintiff lives every day in excruciating back

pain, violating his rights under the Eighth and Fourteenth Amendments against cruel and unusual punishment.

### COUNT 2 – NEGLIGENCE

106. Plaintiff re-alleges and re-incorporates paragraphs 6 through 99.

107. Plaintiff's status as an inmate in CDCR creates a level of dependency, in which inmates detrimentally rely on prison staff for protection from other inmates. That creates a "special relationship" and establishes a duty of care for the prison staff to protect Plaintiff. *Giraldo v. California Dep't of Corr. Rehab.*, 168 Cal. App. 4th 231, 252-53, 85 Cal. Rptr. 3d 371, 387 (2008).

108. Plaintiff saw a specialist who said he needed surgery.  He saw another one who said he needed surgery.  He has been denied repeatedly.  He has repeatedly informed the prison of his pain and received inadequate pain medications.  When he was taken off the methadone due to his request, he thought he would be put on something else instead of nothing.  Plaintiff has been suffering for years, despite his repeated complaints to prison staff.

109. As a result of not being provided his back surgery and pain medications, Plaintiff lives every day in excruciating back pain from the negligence of prison staff.

### REQUEST FOR TEMPORARY RESTRAINING ORDER

110. Plaintiff has suffered and will continue to suffer excruciating pain if Defendants do not have to order his surgery and allow him pain medications.

111. Based on the time legal remedies would take and the continuing severe pain, there is no adequate remedy at law.

112. Plaintiff has a substantial likelihood of prevailing on the merits because of the recommendations of two specialists, his repeated complaints about his severe pain, and the prison's failure to address it.

113. The injury faced by Plaintiff outweighs the harm sustained by Defendants if the TRO were granted.  The injury faced by Plaintiff is excruciating pain in his back.  In contrast, Defendants would face little to no harm approving the surgery and pain medications.

114. Issuing a TRO would not hurt the public interest.  Neither the defendants, the public, nor other inmates would experience a problem with Plaintiff getting his back surgery, pain medications, and finally having relief.  On the contrary, enforcing constitutional rights serves the public interest.

115. Plaintiff can post a bond under Federal Rule of Civil Procedure 65(c) depending on the amount.

<u>REQUEST FOR RELIEF</u>

Plaintiff requests this Court grant the following relief:

1. Set his application for injunction for hearing at the earliest possible time.

2. Issue a temporary restraining order until a hearing can be held, requiring Defendants order Plaintiff receive the back surgery recommended by Dr. Yoo in ¶ 28 and pain medications.

3. After the hearing is held, issue an injunction requiring Defendants to order Plaintiff receive the back surgery recommended by Dr. Yoo in ¶ 28, and pain medications.

4. Cost of prosecuting these claims with attorney fees under 42 U.S.C. § 1988, against all Defendants.

5. Any other relief that the Court, in exercising its wisdom and judgment, deems proper.

DATED: April 25, 2022.

By: s/ Benjamin Rudin
BENJAMIN RUDIN
Attorney for Plaintiff
Kevin Hagan

I, KEVIN HAGAN,

1. Have reviewed the complaint,

2. Know and believe all the allegations I personally know of to be true,

3. Believe no allegations are outside my personal knowledge. However, if they are, I believe them true based on specified information or documents.

I declare under penalty of perjury under the United States and California laws that the foregoing is true and correct—dated this 2 day of MAY 2022.

KEVIN HAGAN, Declarant